No. 95-2955

Sligo, Inc.,                          *
                                      *
    Plaintiff/Appellee,          *  Appeal from the United States
                                      *  District Court for the
    v.                           *  Eastern District of Missouri
                                      *
Cynthia R. Nevois and                 *
Michelle A. Vlahek, Trustees          *
of the Raymond H. Cornell             *
Revocable Trust,                      *
                                      *
    Defendants/Appellants.       *

Submitted: April 12, 1996

Filed: May 21, 1996

Before WOLLMAN and HANSEN, Circuit Judges, and KYLE,[*] District Judge.

KYLE, District Judge.

    Plaintiff/Appellee Sligo, Inc. ("Sligo"), a closely held corporation, commenced this diversity action against Defendants/Appellants Cynthia Nevois and Michelle Vlahek ("Trustees") seeking a declaration that it properly exercised an option to purchase shares of Sligo stock held by the Trustees, or alternatively, an order of specific performance requiring the Trustees to accept Sligo's tender offer for the shares. The district court found for Sligo and ordered the Trustees to convey the stock certificates. The Trustees appeal, claiming the district

_____

    [*]The HONORABLE RICHARD H. KYLE, United States District Judge for the District of Minnesota, sitting by designation.

court's order is contrary to the express language of Sligo's option and contesting the proper purchase price for the shares. Sligo subsequently filed a motion to dismiss the appeal as moot on the grounds the Trustees complied with the district court Order and conveyed the stock during the pendency of this appeal. For the reasons set forth below, we deny Sligo's motion to dismiss this appeal, and we reverse the decision of the district court.

## I. BACKGROUND

The parties dispute the proper method for calculating the purchase price of Sligo stock under the terms of Sligo's option. The Trustees claim the purchase price should be based on the book value of Sligo shares on December 31, 1989. Sligo maintains the purchase price should be based on the book value of the shares on January 31, 1994. The following facts underlying this conflict are undisputed.

### A. Acquisition of Sligo and the Restrictive Stock Transfer Agreement

In July, 1988, Raymond H. Cornell ("Cornell"), and J. Richard Hauser ("Hauser") engineered a leveraged buyout of Sligo, a St. Louis-based industrial supply distributor. (J.A. at 4-5, 37, 96-97.) Cornell and Hauser each owned fifty percent of Sligo's outstanding shares under the terms of the acquisition, and each served as an officer and director of Sligo. As a condition of financing this acquisition, Sligo's lenders required it to purchase and maintain life insurance policies in the amount of $1 million on the lives of Cornell and Hauser and required that the life insurance proceeds be applied toward repayment of the financing loans if either Hauser or Cornell died before the loans were repaid. Sligo later purchased additional life insurance policies on the lives of Cornell and Hauser in the amount of $500,000.00 each. Sligo was the beneficiary of these life insurance policies.

2

In December, 1988, Hauser and Cornell entered into a Restrictive Stock Transfer Agreement ("Agreement") to restrict each owner's ability to transfer his shares of Sligo stock. (J.A. at 969.) This Agreement provided Sligo with an option to purchase an owner's share upon certain events and under certain conditions, as more fully set forth below. After executing the Agreement and pursuant to its terms, Cornell transferred his shares of Sligo stock to an inter vivos revocable trust (the "Trust"), of which he was the sole trustee.

Under the Agreement, Sligo's option was triggered when a specified "transfer" occurred.[2] Its option read in pertinent part:

> 3.4 <u>Purchase Options Upon Death of a Shareholder or Other Involuntary Transfers</u>.
> . . .
>      (b) <u>First Option of Corporation</u>. Within thirty (30) days of the Corporation's receipt of actual notice of a Transfer . . . the Corporation may exercise an option hereby granted to the Corporation to purchase all, but not less than all, of the Shares so Transferred . . . for the price and upon the other terms provided in Article V hereof. . . .

(J.A. at 13.) The Agreement treated the death of a shareholder as a "transfer" which accordingly triggered Sligo's option to purchase

---

[2] The Agreement defined the term "transfer" as follows:

> (e) <u>Transfer</u>. All references herein to "Transfer" shall mean and shall include any sale, exchange, gift, assignment, transfer in trust or otherwise, . . . . In addition, if for any reason any Present Shareholder ceases to be at least an officer, a director or an employee of the Corporation, a "Transfer" subject to the provisions of Section 3.4 hereof shall be deemed to have occurred with respect to the Shares of such Present Shareholder on the first Business Day on which such Present Shareholder is not an officer, director or employee of the Corporation.

(J.A. at 10.)

3

the deceased shareholder's shares.

The Agreement also established two mechanisms for setting the value of the shares in the event of a transfer. The first was a "fail-safe" provision which read:

> 5.2 <u>Market Value</u>. Unless otherwise specified in a certificate of agreed value then in effect pursuant to Section 5.3 hereof, the "Market Value" of Shares as used herein shall mean:
> . . .
> (b) <u>Death and Insurance</u>. In the case of a sale and purchase of Shares by the Corporation under [the terms of its option] as a result of the death of a Shareholder if the Corporation receives life insurance proceeds upon the death of such Shareholder, <u>the Market Value shall mean the book value of said Shares for the period ending December 31, 1989, and One and one-half (1 ½) times said book value thereafter</u>. Book value shall conclusively be determined by the accountant or accounting firm then servicing the Corporation.

(<u>Id.</u> at 16 (emphasis added).) As an alternative, the Agreement provided that the shareholders could change the Market Value as determined under Section 5.2(b) by executing a "Certificate of Agreed Market Value." The amount agreed upon in such a certificate superseded the Market Value as set out in Section 5.2(b). Specifically, Section 5.3 of the Agreement provided:

> 5.3 <u>Certificate of Agreed Market Value</u>. The Shareholders and the Corporation may, at any time and from time to time, determine "Market Value" as used in Section 5.2 hereof by executing and filing with the Corporation a written instrument wherein such determination is set forth, whereupon, for the period of time stated in such instrument, "Market Value" so determined shall supersede "Market Value" as determined in Section 5.2. . . .

(<u>Id.</u> at 16-17.) Cornell and Hauser executed a Certificate of Agreed Market Value effective for the period August 1, 1988 through December 31, 1988. They did not execute a subsequent Certificate of Agreed Market Value.

4

**B.    Sligo's Attempt to Exercise its Option**

Cornell committed suicide on January 31, 1994, and the Trustees succeeded him as successor co-trustees of the Trust.[3] Under the Agreement, his death constituted a "transfer" which triggered Sligo's option to purchase the shares held in the Trust. On February 18, 1994, Sligo exercised its option and notified the Trustees of its intention to purchase the shares of Sligo stock held in the Trust.

In order to determine the purchase price of these shares, Sligo contacted "the accounting firm then servicing the Corporation," Deloitte & Touche, and requested that it calculate the book value of Sligo <u>as of the date of Cornell's death, January 31, 1994</u>.

That book value was calculated using Sligo's financial statements for 1993 and information obtained from Sligo regarding income for the period January 1-31, 1994. Deloitte & Touche determined the book value of all Sligo shares on January 31, 1994 to be $546,523.00. Cornell's fifty percent interest was $273,261.50, and Sligo tendered one and one-half times this amount, $409,892.25, to the Trustees.[4]

Although Deloitte & Touche did not calculate the book value of Sligo shares as of December 31, 1989 -- the date referred to in

---

[3]    A third individual, Michael A. Lazaroff, was also named as a successor and co-trustee of the Trust; he resigned as a co-trustee on February 16, 1994. (J.A. at 38.)

[4]    In calculating this value, Deloitte & Touche did not include the $1.5 million due Sligo from the life insurance policies payable upon Cornell's death. Sligo did not receive payment on these policies until approximately March, 1994, at which time it received $504,247.38 from Kentucky Central Life Insurance Company and $1,000,638.58 from Allianz Life Insurance Company. (J.A. at 715, 716.)

Section 5.2(b)of the Agreement -- the parties do not dispute that the book value on that date was $879,724.00.  The book value of Cornell's fifty-percent interest in Sligo at that time was $439,862.00.  (J.A. at 724.)

Based on the accountant's calculation of the January 31, 1994 book value, Sligo offered the Trustees $409,892.25 for the Trust's shares of Sligo stock.  The Trustees refused the offer, claiming that Sligo had improperly calculated the book value and asserting the following: First, because the shareholders and Sligo never determined "Market Value" under the procedure established in Section 5.3, the "fail safe" provision in Section 5.2(b) applies, and the "Market Value" of the shares was one and one-half times their "book value" as of December 31, 1989, not January 31, 1994.  They accordingly assert that Sligo must pay $659,793.00 for the shares -- the agreed upon December 31, 1989 book value of $439,862.00 multiplied by 1.5.

Second, and alternatively, if the book value is to be calculated as of the date of Cornell's death, the $1.5 million due to Sligo from Cornell's life insurance policies should have been included in the determination of book value.

Third, and also based on the calculation of book value as of the date of Cornell's death, the accountants "did not make an independent review of the records of Sligo in order to calculate book value" and instead relied on unreviewed information Sligo supplied.  (Appellant's Br. at 13.)  They accordingly claim the accountants did not "determine" the book value of the shares as required by Section 5.2(b) of the Agreement.

C.    District Court Proceedings

The parties submitted their claims to the district court on a stipulated record. In its Findings of Fact, Conclusions of Law and Final Order, the district court concluded Sligo had timely and validly executed its option. It held that the purchase price of the shares to be purchased under Section 5.2(b) should be based on their book value as of January 31, 1994, the date of Cornell's death. The district court further concluded that Deloitte & Touche properly excluded the $1.5 million in life insurance proceeds payable to Sligo from the calculation of the shares' book value as of January 31, 1994. Finally, the district court concluded that Deloitte & Touche complied with the Agreement's term that it "determine" the shares' book value, notwithstanding its failure to independently review financial records, because: (1) the Agreement did not explicitly require the accountants to conduct an audit and (2) the Trustees failed to show the book value was determined in an arbitrary or capricious manner. Based on these determinations, the district court entered judgment in Sligo's favor and ordered the Trustees to accept Sligo's tender of $409,892.25 and convey the shares.

### D.    Post-Trial Proceedings

The Trustees filed a notice of appeal to this Court on July 25, 1995. They simultaneously filed a motion with the district court seeking to stay execution of its Order pending resolution of their appeal; this motion was denied. On August 14, 1995, Sligo informed the district court that it intended to execute on the Order pursuant to Rules 69 and 70 of the Federal Rules of Civil Procedure. (Wunderlich Aff. ¶ 7.) Sligo also informed counsel for the Trustees that unless they tendered the shares, Sligo would deem such inaction as refusing to comply with the terms of the Order. (Id., Ex. E.)

The Trustees subsequently advised Sligo that they would accept Sligo's tender of $409,892.25 for the shares to avoid risk of a

contempt citation, but without waiving or prejudicing their appeal rights. (Id. ¶ 15 & id., Exhs. H, J.)  Accordingly, the certificate conveyed to Sligo contained the following reservation of rights clause:

> Without waiving any issue or right on appeal, Trustees of the Raymond H. Cornell Trust dated 10-3-90 hereby deliver to Sligo, Inc. the 50 shares of common stock of Sligo, Inc. as directed in the Final Order of Judge Shaw signed on June 29, 1995 in Sligo, Inc. v. Cynthia R. Nevois, et al., Cause No., 4:94-cv-670CAS, in the United States District Court for the Eastern District of Missouri.

(Id., Ex. K.)  Sligo tendered a check for $409,892.25, which the Trustees deposited in a separate account pending resolution of this appeal.  (Nevois Aff. ¶ 7 & id., Ex. A; Vlahek Aff. ¶ 7 & id., Ex. A.)

Sligo currently claims the Trustees abandoned their appeal because they "accepted" payment for the shares.

## II. DISCUSSION

### A.    Motion to Dismiss the Appeal

Sligo's motion to dismiss this appeal is premised on the "acceptance of benefits" doctrine, which provides that an appeal from a court judgment may be barred where the appealing party has voluntarily and intentionally accepted the benefits of that judgment.  See Commercial Union Ins. v. Walbrook Ins., 41 F.3d 764, 769 (1st Cir. 1994); Wynfield Inns v. Edward LeRoux Group, Inc., 896 F.2d 483, 489 (11th Cir. 1990); International Harvester Credit Corp. v. East Coast Truck, 547 F.2d 888, 889 (5th Cir. 1977).  The application of this doctrine requires a party to accept the benefits of a judgment under circumstances which "indicate an intention to finally settle and compromise a disputed claim."  In re Tudor Assoc., Ltd. II, 20 F.3d 115, 118 (4th Cir. 1994)

8

(quotation omitted).

In the present case, the circumstances clearly indicate that the Trustees did not intend to finally settle their dispute with Sligo when they conveyed the shares. The conveyance was made pursuant to an adverse court order and under a threat of contempt. Moreover, the Trustees repeatedly and consistently informed Sligo that they did not intend to waive their appeal by conveying the shares; the certificate itself specifically memorializes this position. The Trustees did not seek to take "advantage" of the court order compelling them to transfer the shares. This was precisely the result the Trustees litigated to avoid. We accordingly deny Sligo's motion to dismiss this appeal.

**B.    Merits of the Appeal**

The Trustees raise three issues on appeal: (1) whether the district court properly interpreted Section 5.2(b) of the Agreement in determining the date for establishing the book value of the shares; (2) whether the insurance proceeds payable to Sligo upon Cornell's death should have been included in the "Market Value" of the shares if the date for determining book value is January 31, 1994; and (3) whether the accountant "determined" the book value as required under the Agreement. We need only reach the first issue.

**1.    Section 5.2(b)**

Sligo and its shareholders did not execute a Certificate of Agreed Market Value pursuant to Section 5.3 for the period following December 31, 1988. As a result, the "Market Value" determination is governed by the fail-safe clause found in Section 5.2(b), which provides that if a shareholder dies and Sligo receives life insurance proceeds, and if there is not a Certificate of Agreed Market Value covering the date of such a shareholder's death:

the Market Value shall mean the book value of said Shares <u>for the period ending December 31, 1989</u>, and One and one-half times <u>said book value</u> thereafter.  (Emphasis added.)

The Trustees argue that the words "said book value" refer to the previously stated book value, and thus expressly require the market value of the Shares to be determined as of December 31, 1989.  Sligo argues that the phrase "for the period ending December 31, 1989" qualifies the reference to "Market Value" in this clause, and does not modify the term "book value."  Sligo maintains the book value to be used in this section is the book value as of the date of the shareholder's death, January 31, 1994. Both parties rely on the alleged plain meaning of Section 5.2(b) to support their conflicting interpretations.

The district court did not find Section 5.2(b) ambiguous, found the Trustee's construction of Section 5.2(b) "without merit," and concluded as follows:

December 31, 1989, is clearly not the only date on which book value is to be calculated.  Due to the use of the word 'thereafter,' the Court concludes that the Agreement provides for the purchase price to be calculated on dates after December 31, 1989.  Said date is used by the Agreement as a line of demarcation between when the purchase price is straight book value and when it is one and one-half times book value.

(J.A. at 971-72.)

10

## 2.    Legal Standard

We review the district court's interpretation of Missouri law[5] de novo.  Bell Lumber & Pole Co. v. United States Fire Ins., 60 F.3d 437, 441 (8th Cir. 1995).

The construction and interpretation of a contract is a matter of law, and no deference is paid to the trial court's interpretation.  See Central City Ltd. v. United Postal Sav. Ass'n, 903 S.W.2d 179, 182 (Mo. Ct. App. 1995).  Whether the language of a contract is ambiguous is also a question of law.  CIT Group/Sales Fin., Inc. v. Lark, 906 S.W.2d 865, 868 (Mo. Ct. App. 1995); see also Maurice Sunderland Architecture, Inc. v. Simon, 5 F.3d 334, 337 (8th Cir. 1993) (explaining that "[t]he determination that a contract is or is not ambiguous is a legal determination, and no deference is paid to the trial court's determination on that issue" and "[i]f the contract is unambiguous, the interpretation is a question of law and determined de novo") (applying Minnesota law).[6]  A contract is not ambiguous simply because the parties disagree as to its meaning.  Young Dental Mfg. Co. v. Engineered Prod., Inc., 838 S.W.2d 154, 155-56 (Mo. Ct. App. 1992).  Rather, to determine whether a contract is ambiguous, the court must "consider the whole instrument and give the words their ordinary and natural meaning."  Angoff v. Mersman, 917 S.W.2d 207, 210 (Mo. Ct. App. 1996) (quotation omitted).

Accordingly, a contract is ambiguous only if "its terms are

---

[5]    Section 8.9 of the Agreement provides that "[t]his agreement shall be subject to and governed by the laws of the State of Missouri."  (J.A. at 22.)

[6]    In its Brief, Sligo claims that the district court relied on extrinsic evidence in "resolving the issues in this case," and that as a result, its conclusions must be reviewed under the clearly erroneous standard.  (Appellee's Br. at 14.) This is clearly not the law with respect to the district court's interpretation of the language of the Agreement.

11

susceptible of more than one meaning so that reasonable persons may fairly and honestly differ in their construction." CIT Group Sales, 906 S.W.2d at 868; see also Central City, 903 S.W.2d at 182 ("[w]here a contract is not ambiguous, we ascertain the intent of the parties by giving the language used its natural, ordinary and common sense meaning"). A court may not use "forced or strained meanings" and "cannot use extrinsic or parol evidence to create an ambiguity." Young Dental, 838 S.W.2d at 156. If no ambiguity exists, the court must construe and enforce the contract according to its plain meaning. Schuster v. Shelter Mut. Ins., 857 S.W.2d 381, 383 (Mo. Ct. App. 1993); see also Lake Cable, Inc. v. Trittler, 914 S.W.2d 431, 435-36 (Mo. Ct. App. 1996)("[w]hen a contract uses plain and unequivocal language, it must be enforced as written").

### 3.    Application

We agree with the district court that Section 5.2(b) is not ambiguous, but disagree with its interpretation of the plain language used in this section.

The crux of the parties' dispute, and the claimed district court error, centers upon the meaning of the word "said" as it is used in Section 5.2(b). Missouri courts have explained that the plain meaning of the word "said" is "before mentioned," "already spoken of" or "aforesaid" and that it "refers to an appropriate antecedent." York Pharmacal Co. v. Henry C. Beekmann Realty & Inv. Co., 304 S.W.2d 40, 42 (Mo. Ct. App. 1957) (quotation omitted); accord Smith v. Stowell, 125 N.W.2d 795, 797 (Iowa 1964) (quotation omitted); see also Barilaro v. Consolidated Rail Corp., 876 F.2d 260, 265 (1st Cir. 1989) (noting that "[i]n usual parlance, when the word 'said' precedes another term it is so used in order to call the reader's attention to an antecedent meaning or designation for the term"); Black's Law Dictionary 1336 (6th ed. 1990) (defining "said" as "[b]efore mentioned" and noting that "[t]his

12

word is frequently used in contracts, pleadings, and other legal papers with the same force as 'aforesaid'"). We agree with this construction.

Applying this construction to Section 5.2(b), its meaning, we believe, becomes clear and not reasonably susceptible to conflicting interpretations. Section 5.2(b) creates two distinct periods for calculating the purchase price of the shares, depending upon the date this provision is triggered. The first period is "for the period ending December 31, 1989." The second period is for any time "thereafter." With respect to calculating the book value before December 31, 1989 -- the first period -- this section provides that the Market Value shall mean the "book value of the shares" for the period ending on that date. With respect to calculating the Market Value anytime after the first period, the Market Value is one and one-half times "said <u>book</u> value." In other words, the Market Value is one and one-half times the previously mentioned or aforesaid <u>book</u> value. In this section, the previously mentioned book value is the <u>book</u> value of the shares <u>on December 31, 1989</u>. This language is plain and unequivocal.

To hold otherwise would be to ignore the use of the word "said" in this section, or to give it a strained or unnatural meaning. This we may not do. <u>See</u> <u>Liberty Storage Co. v. Kansas City Terminal Warehouse Co.</u>, 340 S.W.2d 189, 192 (Mo. Ct. App. 1960) (explaining "[w]e are not at liberty to ignore the presence of [a word in a contract], but must attach meaning and significance to it, because every part of the contract must be given effect, if fairly and reasonably possible"). If the paries had wanted the fail-safe clause to use the current book value of the shares, they could have easily provided language to this effect.[7] They did not.

---

[7] For example, rather than providing the purchase price to be the book value of the shares for the period ending December 31, 1989, "and One and one-half times <u>said book value</u> thereafter," the Agreement, if the parties wanted to use the current book value, could simply have provided the purchase price to be the book value of the shares for the period ending December 31, 1989, "and One and one-half times <u>the current book value</u> thereafter," or "and One and one-half times <u>their book value</u> thereafter."

13

They specified the book value on December 31, 1989.

With respect to the district court's construction, we note its focus was on the term "thereafter." The district court found that, because of this term, the date December 31, 1989 marked a "line of demarcation" between when the purchase price was straight book value and when it was one and one-half times book value. It concluded that Section 5.2(b) did not provide a fixed date to be used to determine the book value, but merely provided that the book value at the time the purchase price was calculated would be multiplied by 1.5.

The district court read too much into Section 5.2(b). We agree that Section 5.2(b)contemplates that the purchase price may be calculated on different dates, and that December 31, 1989 marks a line of demarcation between when the purchase price will be straight book value and when it will be 1.5 times the book value. It does not follow, however, that the book value used in the calculation must change merely because the multiplier applied to that book value changed. This additional condition is found nowhere in the Agreement. To the contrary, as stated above, the book value specified by the Agreement is the previously mentioned book value of the shares on December 31, 1989.

Moreover, this construction is consistent with the remaining provisions of the Agreement. The Agreement establishes a fixed purchase price for the shares for the period August 1, 1988 to December 31, 1988. Section 5.2(b) is a fail-safe provision which establishes two alternative fixed purchase prices for the shares for the period following December 31, 1988. This provided a

14

predictable basis from which the parties could determine whether to supersede the purchase price pursuant to Section 5.3 with a current valuation of the shares.  If the parties had intended to deviate from the values established by the fail-safe provision, they could have easily done so.[8]

Based on the foregoing, we find the language of Section 5.2(b) is not ambiguous.  The purchase price for the Trust's shares is one and one-half times the book value of those shares on December 31, 1989, not their January 31, 1994 book value -- the date of Cornell's death.  The parties do not dispute that the book value of Cornell's shares on December 31, 1989, was $439,862.00.  The purchase price of the Trust's shares is accordingly one and one-half times that amount, or $659,793.00.  As a result of this conclusion, we need not address the remainder of the Trustees' claims.[9]

## III. CONCLUSION

The decision below is reversed and this action is remanded to the district court with directions to enter judgment in favor of the Trustees in an amount consistent with this Opinion.

---

[8]    The Court also notes that calculating the book value at the end of an accounting period rather than the purchase date is reasonable.  See 1 O'Neal, Close Corporations § 7.30 at 141 (3d ed. 1994) ("Ordinarily, in order to avoid closing books, making an audit and taking inventory, it is preferable to provide that book value will be calculated as of the end of the last preceding fiscal or calendar year or some other designated accounting period").

[9]    The Trustees concede that the remaining issues regarding life insurance proceeds or the accountants' actions need be addressed only if it is determined that the book value is determined as of a date other than December 31, 1989.

15

A true copy.

      Attest:

             CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.