# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-1175

STEPHEN A. GEROW,

*Plaintiff-Appellant,*

v.

ROHM & HAAS COMPANY and MORTON
INTERNATIONAL, INC.,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 6538—**Matthew F. Kennelly**, *Judge.*

———————

ARGUED SEPTEMBER 20, 2002—DECIDED OCTOBER 16, 2002

———————

Before EASTERBROOK, RIPPLE, and KANNE, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* When Rohm & Haas
acquired Morton International in 1999, it had to deal with
the change-of-control agreements (often called Golden
Parachutes) that Morton had awarded to its executives.
Any change of control (a term carefully defined in the
contracts) triggered a three-year "employment period" for
Morton's senior executives. During this span managers'
positions, salary, fringe benefits, and perquisites were pro-
tected against erosion. The contract (the "Morton Agree-
ment") provided benefits in the event of death, disability, or

discharge without cause; employees could trigger the discharge benefits by quitting. Rohm & Haas decided to negotiate individually with executives entitled to these benefits. It offered Stephen Gerow about $1 million more than his existing deal, in exchange for a release of all legal claims and an extension (from two years to three) of Gerow's noncompetition agreement. Gerow, who had been told that his services were no longer required, took the offer and signed a new contract (the "Rohm Agreement"). The Rohm Agreement tracked the Morton Agreement, though a date certain (July 31, 1999) replaced the elaborate definition of the "Change of Control Date" in the Morton Agreement. Two side agreements included the release and the establishment of a trust to hold the sums (about $2.3 million) that Gerow was to receive for his promise not to compete with Rohm & Haas. (The trust was to hand over these funds, plus investment income, after confirming that Gerow had refrained from competition for the agreed time.)

Gerow received more than $4.5 million in severance (including payments in lieu of fringe benefits and retirement contributions that the firm would have made had he remained employed) and compensation for the promise not to compete. He was not satisfied and filed this suit seeking almost $10 million extra—the amount he says he would have received had he remained employed during the three years after the acquisition, and had his pay and benefits been increased to match those of Morton's very top executives, whose packages (Gerow insists) are the measure of his protection under ¶3 of the Rohm Agreement. Gerow's position, in other words, is that he is entitled to *both* the pay he would have received had he stayed, and the severance benefits he actually received on his discharge. He insists that this is the consequence of the provisions creating a three-year "employment period" with protection of salary and status. The district judge was unpersuaded and granted summary judgment to Rohm & Haas. 2001 U.S.

Dist. LEXIS 15698 (N.D. Ill. Sept. 28, 2001). He treated the "employment period" as defining the time of protection after a change of control during which salary and benefits are guaranteed if the executive stays, and severance must be paid if the executive quits or is fired. Using a single phrase to measure the duration of both packages does not entitle the executive to *receive* both sets of benefits, the judge concluded. Later the judge resolved in Gerow's favor a few details about the calculation of the severance package and entered judgment for a few thousand dollars attributable to delay in making one payment and the miscalculation of another, plus about $13,000 in attorneys' fees. 2001 U.S. Dist. LEXIS 20995 (N.D. Ill. Dec. 17, 2001). Gerow asks us to award him the whole $10 million.

Although the agreement is of a common variety, derived from language that Wachtell, Lipton, Rosen & Katz drafted for Morton and many other potential targets of acquisition bids, Gerow's understanding of his entitlements is novel. Golden Parachutes protect executives from surprise in-security, and thus make them more willing to invest human capital in their firms; by making a change of control prof-itable to the executive. Moreover, the agreement aligns managers' interests with those of investors, who usually gain substantially from takeovers and do not want manag-ers to resist in order to protect their positions. Neither of these purposes calls for compensating an executive *twice* on a change of control, however—once through guaranteed sal-ary, and a second time through guaranteed severance over the same period. The parties could not find any published decision discussing this agreement's language, or any close variation, and neither could we. Nor are the parties aware of any executive covered by an agreement of this kind who has received both salary and severance for the same period. Illinois law governs here (the agreement has a choice-of-law clause), but none of that state's distinctive principles bears on the issues. It is unnecessary for us to blaze new legal

ground. This dispute can be resolved by a careful reading of the agreement.

Gerow offers one textual argument and two confirming inferences. The textual argument rests on the language of ¶2, which defines the "employment period":

> The Company [Rohm & Haas] hereby agrees to continue the Executive [Gerow] in its employ, and the Executive hereby agrees to remain in the employ of the Company, for the period commencing on the Effective Date [the day the contract was signed] and ending on the third anniversary of such date . . . (the "Employment Period").

This creates an unambiguous right to *be* employed, and thus to receive the salary and other benefits identified in ¶3 (which defines "terms of employment") as damages for breach, Gerow insists. The first confirming inference is the fact that the contract contains ¶3 at all, even though it was signed after Gerow's last day on the job. Why specify the terms of employment in such detail if these cannot have any effect? The second confirming inference lies in the structure of ¶5, captioned "Obligations of the Company upon Termination." Paragraph 5(a), which says what happens if Gerow dies before the employment period ends, names some death benefits and adds that the "Agreement shall terminate without further obligations". Similar language appears in ¶5(b), which deals with disability, and ¶5(c), which handles discharge for cause. But ¶5(d), which covers discharge without cause, names a lot of benefits but omits the "without further obligations" language—showing, Gerow contends, that there *were* further obligations, namely the whole package of benefits in ¶3.

None of these arguments carries much water. Take the fact that the contract was signed after Gerow's last day at work. If this entitled him to all of the employment benefits under ¶3 (because the company knew that he would not

work, yet included ¶3 anyway), then it *also* entitles him to death benefits under ¶5(a) (because the company knew that he was alive on his terminal working day, yet included ¶5(a) anyway), disability benefits under ¶5(b) (same rationale), and so on. The argument about ¶3 is no better than the equivalent argument about ¶5(a), which is to say that it is no good. The agreement's structure is attributable not to some subtle effort to reflect Gerow's status, but to its genesis in the Morton Agreement, which dates to 1990. Rohm & Haas adopted the existing benefits wholesale and added some new ones to induce Gerow to release any potential claims and extend the restrictive covenant. This says nothing about what the benefits carried over from the Morton Agreement may be.

Now take the absence of "without further obligations" in ¶5(d). Drawing inferences from omissions is risky in the best circumstances and untenable here, for the language "without further obligations" would have been out of place. There *were* further obligations—some of them detailed in ¶5(d) itself and others in ¶10, which dealt with restrictive covenants. These covenants were not going to matter if Gerow had died, so it is no surprise that ¶5(a) and ¶5(d) differed. It would have been possible to reword ¶5(d) to add something like "without further obligations except to the extent the rest of this paragraph and ¶10 provide for further obligations", but this much was plain from the text and structure of the agreement. Why impute significance to the non-parallel phraseology when the underlying substance was not parallel?

So let us turn to ¶2 and ¶3, which Gerow says give him an explicit right to *be* employed for three years, with the same salary, responsibilities, fringe benefits, office, furniture, and staff. This is an implausible understanding. Every contract is of similar form, and it is a common understanding (on which Holmes remarked long ago) each contracting party can choose between performing and paying damages.

A football coach with a four-year term still may be fired. The coach gets damages, of course—the salary less what he makes elsewhere (or could have made had he mitigated his damages)—but does not keep control of the team. And if the contract contains a liquidated damages provision, then the coach gets that sum instead of the wages-less-other-income calculation. That is how Gerow's contract works too. The deal provides a three-year period of protection and includes a liquidated-damages provision in the form of severance pay plus handsome compensation for refraining from competition during the remainder of the "employment period."

Gerow's reading, by contrast, attributes irrationality to his employer. Why would Rohm promise to pay $2.3 million to induce Gerow not to compete during the three years after the change of control, when on Gerow's reading of ¶2 and ¶3 Gerow was obliged to come to work every day of those three years? Recall the language of ¶2: "The Company hereby agrees to continue the Executive in its employ, *and the Executive hereby agrees to remain in the employ of the Company*, for the period" of three years (emphasis added). Why would the acquirer ever *fire* any executive during the first three years, if the executive had a guaranteed position for that time? Why would ¶5(d) provide for severance benefits that *assume* lack of employment? (One of the severance benefits is three years' pension contributions in lieu of those that the employer would have made had Gerow remained employed. But on Gerow's reading, he receives those pension contributions twice: once as severance under ¶5(d) and again as damages for breach of ¶¶ 2 and 3.) The big contextual clue is not that this agreement contains ¶3, which Gerow finds significant, but that it contains ¶5(d), which on Gerow's view is either useless (because he can't be fired, period) or just an option on Rohm's part to make a magnanimous gesture (because the executive gets full pay whether he stays or not). An employer does not need a written option to make a gift; it can fork over extra money

(subject to limits on waste of corporate assets) any time. Gerow's reading of this contract, in other words, makes no business sense, while Rohm's reading is practical. And it is a fundamental principle of contract interpretation that courts read language to make business sense whenever possible. *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856 (7th Cir. 2002).

What is more, although ¶2 says that "the executive agrees to remain in the employ of the Company", ¶5(d) takes that back. The opening of ¶5(d) reads: "If, during the Employment Period, the Company shall terminate the Executive's employment other than for Cause or Disability, or if the Executive shall terminate employment under this Agreement" then specified benefits must be paid. The executive and the company have identical rights to end the employment without cause; and *whichever* side ends it the executive receives the same severance package. The right to depart with full pockets after a change of control is the most valuable benefit conferred by a Golden Parachute. Employer's and employee's rights are symmetrical. Yet on Gerow's reading of ¶2 an executive who quits within three years breaks his promise and should be required to pay damages for breach, rather than receiving millions in severance. Surely Gerow does not think that ¶2, ¶3, and ¶5(d) read together give the employee an option to quit without cause and *still* be paid both salary and severance. Yet there is no way to read this contract as saying that the total payments are greater if the employee is fired than if he quits during the "employment period" and triggers ¶5(d). The only way to make sense of the executive's right to walk—an option to put his job back to the employer in exchange for the severance package—is to say that all the "employment period" does is measure the *time* during which the employee receives either an undiminished salary (and perks) or a specified severance package. One or the other, but not both.

Quite apart from ¶3, the agreement is extraordinarily favorable to Gerow. One of the benefits he has enjoyed appears in ¶7:

> The Company agrees to pay . . . all legal fees and expenses which the Executive may reasonably incur as a result of any contest or controversy (regardless of the outcome thereof and whether or not litigation is involved) by the Company, the Executive or others of the validity or enforceability of, or liability under, any provision of this Agreement.

Gerow has sent all of his legal bills to Rohm & Haas, which so far has underwritten the litigation against itself—even though Gerow received less than $5 thousand of the $10 million he demanded. An opportunity to litigate on the adversary's dime, without any need to prevail in order to collect, creates a moral hazard, which is mitigated by the requirement that the fees be incurred "reasonably". Like the district judge, we read the word "reasonably" in context to curtail this hazard by requiring not only that the time devoted to advocacy must be reasonable in light of the litigation's nature (a requirement in every fee-shifting situation) but also that the litigating position must be "reasonable" (a filter necessitated by the promise to reimburse even if the claim is unsuccessful). Cf. *Ruckelshaus v. Sierra Club*, 463 U.S. 680 (1983). Otherwise the employer has written a blank check that every employee would seek to cash on the off chance that a court would order the employer to pay more. Gerow asked the district judge to guarantee that he would receive full compensation for the legal costs of an appeal; the judge sensibly declined, remarking that this would be an advisory opinion, as he could not know whether Gerow would appeal at all, let alone whether his arguments (and outlays) would be reasonable. Now Gerow asks us to compel Rohm & Haas to reimburse his appellate fees.

Gerow is on solid ground to the extent that he reads ¶7 as providing for legal fees through final resolution of a dispute, and not simply until a decision by the court of first instance. Still, both the legal position taken and the outlay must be reasonable. A position may be rendered less reasonable, indeed may be shown to be *un*-reasonable, by a judicial decision exposing its fallacies. That is a sound description of Gerow's litigation. He had a legal position never before rejected by any court. He lost in the district court, which wrote a thorough opinion exposing many of the position's weaknesses. At that point Gerow should have packed up his attaché case and retired from the fray. Instead he persevered. That was his right—his contentions are not frivolous—but under the circumstances pressing on was unreasonable and thus at Gerow's expense. There is a gap between what is non-frivolous and what is unreasonable. See, e.g., *Pierce v. Underwood*, 487 U.S. 552 (1989) (discussing the Equal Access to Justice Act, which entitles some litigants to attorneys' fees when the United States takes a position that is not substantially justified—in other words is unreasonable—even though the position is non-frivolous). A "reasonable" position for purposes of this kind of bargain is the sort of cost-justified argument that would be advanced by a solvent litigant who knew in advance that he would have to pay the tab but thought the return (discounted by the risk of loss) greater than the outlay. Despite the assurance of Gerow's distinguished appellate counsel that he would have paid every penny himself without ¶7 in the picture, we do not think this likely. Why throw good money after bad? In pressing this appeal Gerow passed beyond the point of reasonableness but did not cross the line into litigation abuse. As a result, each side must bear its own legal fees on this appeal.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*