# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 06-1067/1068

_____

Peggy J. Deal,                   *
                                           *

        Appellee/Cross-Appellant,  *

                                           *   Appeals from the United States
     v.                              *   District Court for the
                                           *   Eastern District of Missouri.

Consumer Programs, Incorporated,  *

                                           *

        Appellant/Cross-Appellee.  *

_____

Submitted: September 28, 2006
Filed: December 6, 2006

_____

Before RILEY and COLLOTON, Circuit Judges, and KYLE,[1] District Judge.

_____

RILEY, Circuit Judge.

In May 2004, Peggy J. Deal (Deal), an executive with Consumer Programs, Incorporated (CPI), was terminated without cause following a change of control within CPI. Deal brought suit against CPI, claiming damages for her unaccrued annual base salary, annual bonus, lump-sum cash severance payment, and stock options. Following mediation, CPI paid Deal her severance payment, but the parties were unable to resolve the remaining issues. Both parties moved for summary

_____

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, sitting by designation.

judgment. The district court[2] held Deal's written Employment Agreement (Employment Agreement) required CPI to pay Deal's unaccrued base salary and bonus, but found Deal failed to exercise her option properly to purchase stock. Both parties appeal. We affirm.

## I.    BACKGROUND

On October 21, 2002, CPI employed Deal as an Executive Vice-President under the Employment Agreement. The Employment Agreement contains a one-year term with an automatic renewal clause for an additional one-year period, unless Deal or CPI provides written notice at least sixty days before the renewal date of an intention to terminate the Employment Agreement.

Section 6 of the Employment Agreement sets forth four scenarios under which CPI could terminate Deal's employment: (a) death or permanent disability, (b) for cause, (c) notification before the one-year automatic extension, and (d) payment for involuntary termination without cause. The Employment Agreement specifies Deal's compensation upon each scenario's occurrence. Specifically, subsection 6(d)(2) of the Employment Agreement addresses Deal's compensation following her termination without cause after a change of control:

> If following a Change of Control (i) [CPI] terminates [Deal's] employment (other than for Cause pursuant to Subsection 6(b) hereof), or (ii) [Deal's] employment terminates by reason of [CPI's] termination of this Agreement pursuant to subsection 6(c) hereof, [CPI] shall, at the time of such involuntary termination, make a lump sum cash payment to [Deal] equal to 200% of her Base Salary for the Fiscal Year of

---

[2]The Honorable Rodney W. Sippel, United States District Judge for the Eastern District of Missouri.

termination.[3]  In addition to the payment pursuant to this Subsection 6(d)(2) . . . [Deal] shall be entitled to all remedies available under this Agreement or at law in respect of any damages suffered by [Deal] as a result of an involuntary termination of employment without Cause.

The Employment Agreement also required CPI to pay Deal an annual bonus after a change in control.[4]  Additionally, the Employment Agreement expressly did not obligate Deal to mitigate any damages by seeking other employment.

Deal and CPI also entered into a separate written Stock Option Agreement (Stock Option Agreement), which granted Deal the option to purchase 16,204 shares of CPI common stock at $12.96 per share. Pursuant to the agreement, Deal could exercise her option to purchase stock within ninety days of termination "by giving written notice to [CPI] of the intention to exercise the option, accompanied by full payment of the purchase price of the shares with respect to which the option is exercised."

During the first year of Deal's employment, neither Deal nor CPI terminated the Employment Agreement. Thus, on October 21, 2003, the Employment Agreement automatically became effective for another year.  However, on May 14, 2004, CPI terminated Deal without cause following a change of control.  At the time of her termination, Deal had already earned and received $138,991 of her then-annual base salary of $245,000.  Upon Deal's termination, CPI did not pay Deal's unaccrued base salary, annual bonus, or severance benefits.

---

[3]Deal's annual base salary for the fiscal year of her termination was $245,000. Thus, this subsection contemplates a lump-sum severance payment in the amount of $490,000 (two times $245,000) in the event of Deal's termination without cause following a change in control.

[4]Subsection 5(b) provides, "After a Change of Control, in addition to the Base Salary, [Deal] shall be awarded for each Fiscal Year during the Term of Employment an annual bonus."

In a letter dated June 25, 2004, Deal, through her counsel, sent CPI written notice of her intent to exercise the option to purchase CPI common stock. Deal also demanded the remainder of her annual base salary pursuant to section 5(a) of her Employment Agreement, the severance payment set forth in subsection 6(d)(2), as well as the annual bonus detailed in subsection 5(b). Deal did not accompany her letter with full payment of the shares' purchase price, which totaled $210,004. Rather, the letter stated Deal "intends to exercise her options pursuant to the parties' Stock Option Agreement. . . . and is prepared to tender cash in the amount of $210,004 for her stock. Please inform me if CPI intends to perform its agreement under that contract." CPI did not respond to this letter. On August 4, 2004, Deal's counsel sent a second letter berating CPI's failure to pay Deal and stating: "Under the current circumstances, Ms. Deal will not pay CPI the purchase price for the stock. We assume that CPI would keep the money and refuse to issue Ms. Deal her stock." Again, CPI did not respond to the letter.

Deal sued CPI for breach of the Employment Agreement and the Stock Option Agreement, and sought, *inter alia*, the $106,009 remainder of her annual base salary, a $12,035 bonus payment, the $490,000 severance payment, and damages resulting from CPI's breach of the Stock Option Agreement. The district court ordered the parties to mediation, after which CPI agreed to pay Deal the $490,000 severance payment plus interest, but refused to pay Deal any additional amounts.

The parties filed cross-motions for summary judgment. CPI argued Deal's severance payment was in lieu of her unpaid base salary and annual bonus payment under the Employment Agreement. In response, Deal contended she was entitled to her unpaid base salary and bonus payment, and effectively exercised her stock option. The district court granted summary judgment in favor of Deal regarding Deal's salary and bonus payment claim, and in favor of CPI regarding the stock option claim. Both parties appeal.

## II.	DISCUSSION

### A.	Standard of Review

Our standard of review is a familiar one. When considering a district court's grant of summary judgment, we review findings of fact for clear error and conclusions of law de novo, viewing the facts in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences that may be drawn from the facts. ACLU Neb. Found. v. City of Plattsmouth, 419 F.3d 772, 775 (8th Cir. 2005) (citations omitted). The parties agree Missouri law governs this dispute. "Under Missouri law, summary judgment is appropriate [in a contract case] where the language of the contract is clear and unambiguous such that the meaning of the portion of the contract in issue is so apparent that it may be determined from the four corners of the document." Family Snacks of N.C., Inc. v. Prepared Prods. Co., 295 F.3d 864, 867 (8th Cir. 2002) (internal quotations, citations, and footnote omitted).

### B.	Unaccrued Salary and Bonus Payment

On appeal, CPI challenges Deal's entitlement to her unaccrued salary and annual bonus payment, arguing subsection 6(d)(2) of the Employment Agreement exclusively governs Deal's post-termination payments and only allows recovery of the $490,000 severance payment. According to CPI, a contrary conclusion pays Deal for time not worked, renders a key provision of the Employment Agreement meaningless, and produces an absurd result. We reject CPI's contentions and thus affirm the district court.

"When a contract uses plain and unequivocal language, it must be enforced as written." Lake Cable, Inc. v. Trittler, 914 S.W.2d 431, 436 (Mo. Ct. App. 1996) (citation omitted); see, e.g., Sligo, Inc. v. Nevois, 84 F.3d 1014, 1019 (8th Cir. 1996). To determine whether a contract is ambiguous, we consider the instrument as a whole, giving the words contained therein their ordinary meaning. Young Dental Mfg. Co. v. Engineered Prods., Inc., 838 S.W.2d 154, 156 (Mo. Ct. App. 1992) (citation

omitted). A contract is not ambiguous merely because the parties dispute its meaning. Sligo, 84 F.3d at 1019 (citing Young Dental Mfg., 838 S.W.2d at 155-56).

With these principles in mind, we note it is undisputed Deal's Employment Agreement was in effect at the time of her termination. On October 21, 2003, Deal's term of employment automatically renewed for an additional one-year period and would expire early only upon Deal's death, permanent disability, or termination for cause. By terminating Deal without cause before her Employment Agreement expired on October 21, 2004, CPI breached its contract with Deal, thus entitling Deal to the remaining amount CPI would have paid her had it fully performed under the contract. See Cornejo v. Crawford County, 153 S.W.3d 898, 902-03 (Mo. Ct. App. 2005) (noting it is well settled a plaintiff's measure of damages for breach of an employment contract is "*prima facie* the contract price agreed upon for such service" (quoting Koenigkraemer v. Mo. Glass Co., 24 Mo. App. 124, 128 (1887))). Because the Employment Agreement specifically provides Deal is not required to mitigate her damages, Deal is entitled to the full amount of her unaccrued annual base salary: $106,009, plus interest.

In a similar fashion, Deal also is entitled to her annual bonus payment, pursuant to subsection 5(b) of the Employment Agreement, which provides "[a]fter a Change of Control, *in addition to the Base Salary*, [Deal] shall be awarded for each Fiscal Year during the Term of Employment an annual bonus." (emphasis added). The Employment Agreement contains no exceptions for payments of the bonus based upon Deal's termination without cause, thus entitling Deal to her annual bonus payment in the amount of $12,035, plus interest.

Notwithstanding this reasoning, CPI contends under Missouri law, where a contract contains more than one provision that can be read to cover the same event, the specific provision takes precedence over a general provision. Applying this rationale, CPI asserts Deal's exclusive compensation for a termination without cause

after a change in control is the $490,000 severance payment detailed in subsection 6(d)(2), and argues this amount is awarded in lieu of Deal's unpaid salary and bonus payment. We disagree. The basic contract principle relied upon by CPI is inapplicable to the present case, because the provisions at issue in this case each may be read in conjunction with one another. Furthermore, CPI's interpretation is contradicted by the unambiguous language of the Employment Agreement. Under subsection 6(d)(2), "*[i]n addition to*" the $490,000 severance payment, Deal *also* is "entitled to *all remedies available under this Agreement or at law* in respect of any damages suffered by [Deal] as a result of an involuntary termination of employment without Cause." (emphasis added). We agree with the district court that under "the plain language of the employment agreement, Deal's lump-sum cash payment was awarded *in addition to–not in lieu of*–all other remedies she may have for breach of her employment agreement." Nothing in subsection 6(d)(2) limits Deal's right to recover both the severance payment and any damages resulting from a breach of contract. See Young Dental Mfg., 838 S.W.2d at 156 (holding courts should not use "[f]orced or strained meanings" to interpret contracts).

As the district court correctly noted, "[h]ad the parties intended the [severance] payment to provide Deal's exclusive remedy for unpaid salary and bonus payments upon CPI's breach of the employment agreement, they could have so provided." Indeed, subsection 6(d)(1)–which applies to terminations occurring *before* a change in control and entitles Deal to her accrued base salary, an additional 100 percent of her annual base salary, and a prorated bonus payment–imposes such a limitation:

> The payments pursuant to this Subsection 6(d)(1) . . . shall be *in full discharge of any claims, actions, demands or damages of every nature and description* which [Deal] might have or might assert against [CPI] . . . in connection with or arising from the termination of [Deal's] employment or the termination of this Agreement.

(emphasis added). The inclusion of this limitation in subsection 6(d)(1), and its noticeable absence from the provision at issue in this case, further indicate the parties did not intend Deal's $490,000 severance payment to limit her ability to recover any unpaid salary and bonus payment.

To buttress its interpretation of the Employment Agreement, CPI directs our attention to Gerow v. Rohm & Haas Co., 308 F.3d 721, 725 (7th Cir. 2002), in which the Seventh Circuit held the plaintiff, who was terminated without cause after a change in control, was entitled to severance pay and other benefits but was not entitled to any additional salary or bonuses for the remainder of his employment term. Although the agreement at issue in Gerow bears some subtle similarities to Deal's Employment Agreement, CPI's reliance on Gerow is misplaced. The severance provision in Gerow explicitly identified an exclusive "laundry list" of amounts recoverable by the plaintiff in the event of termination: the plaintiff's "accrued obligations," which included the plaintiff's accrued salary through termination and certain bonuses; a lump-sum severance payment; and a lump-sum pension enhancement. See Gerow v. Rohm & Haas, Co., No. 00-C-6538, 2001 WL 1159174, at *1 (N.D. Ill. Sept. 28, 2001). However, unlike Deal's Employment Agreement, the Gerow agreement did not include an "all remedies" provision entitling the plaintiff to pursue "all remedies available under this Agreement or at law in respect of any damages suffered." In the absence of such a provision, the Gerow plaintiff could recover only the items specified, which did not include damages for breach of contract. Thus, we find Gerow factually distinguishable from the case at bar.

Finally, CPI contends Deal's interpretation of the Employment Agreement renders subsection 6(d)(2) meaningless by requiring CPI to pay Deal's unaccrued salary and annual bonus, unless CPI provides notice of its intention to terminate the agreement sixty days in advance of its automatic renewal date, because CPI must make a severance payment regardless of whether the Employment Agreement is not renewed or whether a termination follows a change of control. CPI's argument lacks

merit.  If CPI had terminated Deal by giving her sixty days' notice of its intention not to renew the Employment Agreement, CPI would never have breached the Employment Agreement, thus prohibiting Deal from recovering damages for breach of contract.  In contrast, a termination without cause following a change of control *is* a breach of contract, entitling Deal to any damages she suffered as a result of such termination.  Thus, we conclude Deal is entitled to her unaccrued base salary and annual bonus payment.

### C.    Stock Option

Deal cross-appeals, arguing the district court erred in holding Deal failed to effectively exercise her stock option by failing to comply with the terms of the Stock Option Agreement, which provides, "This option shall be exercised by [Deal] . . . by giving written notice to [CPI] of the intention to exercise the option, accompanied by full payment of the purchase price of the shares."  The district court reasoned Deal did not satisfy a condition precedent of the Stock Option Agreement because Deal failed to accompany her written notice with full payment of the purchase price.  We agree.

Under Missouri law, options to purchase are not favored and "are strictly construed against a person whose right it is to exercise the option."  Boatmen's Bank of Mid-Mo. v. Crossroads W. Shopping Ctr., Ltd., 907 S.W.2d 800, 803 (Mo. Ct. App. 1995) (citations omitted).  Acceptance of an option "cannot be made in some manner contrary to the method provided" in the agreement.  Frey v. Yust, 516 S.W.2d 321, 323-24 (Mo. Ct. App. 1974) (citation omitted).  Rather, "[a]n optionee must exercise the option in strict accordance with its expressly stated terms and conditions."  HGS Homes, Inc. v. Kelly Residential Group, Inc., 948 S.W.2d 251, 255-56 (Mo. Ct. App. 1997) (citations omitted).

In this case, it is undisputed Deal did not accompany her written notice of intent to exercise the stock option with full payment of the purchase price in the amount of $210,004.  Instead, Deal merely stated she was "prepared to tender cash," a statement

which does not comply with the express terms of the Stock Option Agreement. Deal attempts to excuse her failure to strictly comply with the agreement by arguing: (1) at the time Deal notified CPI of her intent to exercise the stock option, CPI was holding $490,000 of Deal's money, thus relieving Deal of her obligation to pay CPI an additional $210,004; (2) CPI breached its duty of good faith and fair dealing, thereby excusing Deal's strict compliance with the payment obligation; and (3) CPI waived or is estopped from enforcing the payment requirement. Each of these arguments fails.

In support of her first argument, Deal contends CPI's refusal to forward Deal $490,000 in severance pay excused her obligation to pay CPI an additional $210,004 to exercise the stock option. According to Deal, she effectively exercised her stock option by employing the common-law right of set-off. See Studley v. Boylston Nat'l Bank, 229 U.S. 523 (1913). In Studley, the Supreme Court defined set-off as "a counterclaim which the defendant may interpose by way of cross-action against the plaintiff," or, more broadly speaking, as "the right which one party has against another to use his claim in full or partial satisfaction of what he owes to the other." Id. at 528. However, Studley says nothing with regard to option contracts, and Deal cites no authority reconciling the principle of set-off with Missouri's requirement of strict compliance with the terms of option contracts.

Furthermore, Deal's correspondence to CPI before commencement of this litigation makes no mention of excusing Deal's obligation to submit payment of the purchase price based on CPI's possession of Deal's severance pay. Our review of the record reveals no suggestion by Deal that CPI should have applied the severance payment it owed Deal to the amount owed by Deal to exercise her stock option. Instead, Deal's letters merely mention CPI's acknowledgment that Deal was entitled to the severance payment, and note Deal's absolute refusal to pay CPI anything given her assumption CPI simply would keep the money and refuse to issue the stock to

Deal. Such language does not evidence Deal's intent to effectuate a set-off, and more accurately evidences the absence of a claim of set-off.

Deal next argues CPI breached the Stock Option Agreement by breaching its duty of good faith and fair dealing, thereby excusing Deal's failure to satisfy the payment requirement. This argument also is unavailing. The option to purchase stock was a unilateral contract, which existed separate and apart from Deal's Employment Agreement. Until Deal accepted the option in the prescribed manner, there was no enforceable contract. See HGS Homes, 948 S.W.2d at 255 (holding "until the optionee accepts [the option], there is no enforceable contract" (citation omitted)). Thus, as the district court rightly determined, "CPI was under no duty to assure [Deal] of performance or respond to her requests that it do so."

Finally, Deal contends CPI waived or is estopped from enforcing the payment requirement because CPI permitted another executive, Jeffrey Sexton (Sexton), to exercise his stock option without requiring Sexton to accompany his notice with full payment of the shares' purchase price. The district court rejected this argument, because Deal was not a party to Sexton's agreement, and Deal could not rely on CPI's conduct to constitute a waiver of her condition precedent in her own Stock Option Agreement.[5]

Like the district court, we reject Deal's conclusory and unsupported argument on this point. Under Missouri law, "[w]aiver is the intentional relinquishment of a known right." Thompson v. Chase Manhattan Mortg. Corp., 90 S.W.3d 194, 207 (Mo. Ct. App. 2002) (citation omitted). "To rise to the level of waiver, the conduct

---

[5]The district court also determined there was no evidence in the record to support Deal's allegation. However, this conclusion appears incorrect. Deal's second Statement of Undisputed Facts, filed in September 2005, alleges this incident. Deal also submitted evidence regarding Sexton's notice to exercise the stock option. Notwithstanding the district court's error on this point, Deal is not entitled to relief.

must be so manifestly consistent with and indicative of an intention to renounce a particular right or benefit that no other reasonable explanation of the conduct is possible." Austin v. Pickett, 87 S.W.3d 343, 348 (Mo. Ct. App. 2002) (quotation omitted). Deal alleges no facts, and we find nothing in the record, demonstrating CPI intentionally relinquished its right to assert the occurrence of a condition precedent in Deal's *own* Stock Option Agreement. Furthermore, even if we were to examine CPI's individual transaction with Sexton, CPI's conduct cannot be labeled an unequivocal and intentional relinquishment by CPI sufficient to waive the payment requirement *generally* with regard to *all* stock option contracts in which CPI was a party. We similarly reject Deal's argument with regard to the applicability of the estoppel doctrine, finding Deal fails to satisfy her burden of proving an estoppel. See Thompson, 90 S.W.3d at 208 (declaring "[e]stoppels are not favorites of the law and will not be invoked lightly," and "[t]he party asserting an estoppel bears the burden of proving it" (quotations omitted)).

CPI's failure to pay Deal her severance payment did not excuse Deal's failure to comply with the clear requirements of the separate Stock Option Agreement. Following her termination, Deal viewed CPI's lack of response to her correspondence as evidence of CPI's refusal to honor the Stock Option Agreement. However, had Deal delivered full payment of the stock purchase price and CPI nevertheless refused to issue stock in Deal's name, Deal certainly would be able to seek legal recourse against CPI. In short, Deal was not without ways to protect herself in the event CPI failed to honor the terms of the Stock Option Agreement. We therefore agree with the district court summary judgment is proper on this claim.

## III. CONCLUSION

For the foregoing reasons, we affirm.

_____

-12-