# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-1749

_____

Chavis Van & Storage of Myrtle Beach, Inc.

*Plaintiff - Appellant*

Bruton Properties, LLC

*Plaintiff*

v.

United Van Lines, LLC; Transportation Services Group, Inc.; Unigroup, Inc.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 14, 2015
Filed: April 27, 2015

_____

Before SMITH, BENTON, and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

Chavis Van & Storage of Myrtle Beach, Inc. ("Chavis") appeals from the district court's[1] adverse grant of summary judgment on its breach-of-contract claim against United Van Lines, LLC.; Transportation Services Group, Inc.; and UniGroup, Inc. (collectively, "United"). Chavis also appeals the district court's denial of its motion to compel certain discovery requests. After reviewing the record de novo, we hold that the district court properly granted summary judgment to United. We also hold that the district court did not abuse its discretion in denying the motion to compel. Accordingly, we affirm.

## I. *Background*

United operates a nationwide household goods moving network with over 400 independently owned and operated agents, each of which has entered into a separate agency agreement with United. Since 1993, Chavis has been a full-service United agent. The parties' relationship is governed by an Agency Agreement dated September 10, 2007. The Agency Agreement identifies Chavis as the "Agent" and United as the "Carrier." United, as "the Carrier . . . appoint[ed] [Chavis,] the Agent[,] . . . as its non-exclusive agent solely for the purposes" delineated in the agreement, subject to the terms and conditions set forth in the agreement. The Agency Agreement requires Chavis to comply with all carrier policies, defined as

> such rules, regulations, procedures, and directives issued by the Carrier [United] or directives and decisions of the Carrier's [United's] Board of Directors, whether now existing or as may be issued or amended from time to time during the term of this Agreement, all of which are or shall be adopted and incorporated herein by reference.

---

[1]The Honorable Rodney W. Sippel, United States District Judge for the Eastern District of Missouri.

Section 3 of the Agency Agreement outlines "[t]he duties of the Agent [Chavis],"[2] which provides in relevant part:

> P.  To appoint an origin or destination agent when the Agent [Chavis] is at a point other than point of origin or destination and the Agent [Chavis] is not prepared to perform the necessary origin Transportation Services . . . for a shipper; and the Agent [Chavis] agrees the Carrier [United] will divide the appropriate compensation in accordance with Carrier Policies.

> Q.  To appoint an agent of the Carrier [United] as origin agent when the Agent [Chavis] secures an order involving a Shipment originating from the warehouse of an agent of the Carrier [United]; and the Agent [Chavis] agrees the Carrier [United] will divide the booking compensation in accordance with Carrier Policies.

In turn, United's duties, as the Carrier, includes, among other things,

> compensat[ing] the Agent [Chavis] for Transportation Services rendered in accordance with Carrier Policies and the Pooling Plan, including paying to the Agent a commission on Shipments booked by the Agent [Chavis] or upon Shipments concerning which the Agent [Chavis] has performed Transportation Services, which are accepted and served by the Carrier [United] at rates established by Carrier Policies.

The Agency Agreement provides that Missouri law governs the agreement and concludes as follows:

> R.  This is the entire Agreement between the Carrier and the Agent and supercedes all previous agreements between the parties. No change in this Agreement shall be valid unless made in writing and signed by both parties. No failure to require strict performance or to

_____

[2](All caps omitted.)

exercise any right or remedy hereunder will preclude requiring strict performance or exercising any right or remedy in the future. Any notice required to be given by one party to the other will be effective hereunder when and only when placed in writing and delivered personally or deposited in the United States mail, certified, postage prepaid to the appropriate party.

Chavis filed suit against United for, among other things,[3] breach of contract, alleging that United breached the Agency Agreement by unilaterally changing the roles that United agents play in servicing shipments. Specifically, Chavis alleged that United breached the Agency Agreement and longstanding policies incorporated into it by not assigning Chavis to certain roles in the chain of interstate shipments. According to Chavis, it should have been assigned the roles of origin agent and destination agent (1) based on its status as the "local" or "authorized" agent in the case of non-military shipments, i.e., its status as the agent closest to the original or destination address, and (2) based on its designation as the United agent "authorized" to service Shaw Air Force Base ("Shaw AFB") in South Carolina in the case of military shipments. Chavis alleged that these policies were initially contained in an Agency Manual provided to all United agents and in other written policies and documents.

United moved for summary judgment on the breach-of-contract claim, arguing that (1) the Agency Agreement did not incorporate the Agency Manual, and (2) the Agency Manual did not mandate or prohibit any conduct by United in any event. United attached a September 3, 1996 bulletin in support of summary judgment, which notified its carriers that "[t]he United Van Lines Agency Reference Manual (ARM)

---

[3]Chavis also brought claims for breach of implied contract, breach of the covenant of good faith and fair dealing, promissory estoppel, fraudulent misrepresentation, negligent misrepresentation, tortious interference with business expectancies, and civil conspiracy. The district court dismissed these claims, and Chavis does not challenge those dismissals on appeal.

. . . replaces the former hard-copy Agency Manual." The district court found that the Agency Agreement "plainly provides that Chavis is a 'non-exclusive' agent and is not entitled to act as the sole agent servicing Shaw AFB as a mater of law." The district court also agreed with United that the Agency Manual was not part of the parties' contract based on the "undisputed fact that any hard copy policies pre-dating the bulletin date of September 3, 1996 were replaced by the online agency manual." Nevertheless, the court ordered Chavis to file a supplemental brief to "identify specific carrier policies currently in existence that are allegedly being breached by United" based on Chavis's allegation that "United is violating current, existing policies and not just policies contained in the old written policy manual that has now been replaced."

In its supplemental briefing, Chavis argued that "[i]t is United's current existing policy that the authorized agent in a market is to be appointed as origin and destination agent." In support of this argument, Chavis relied on (1) three sections from "United Van Lines, LLC Policies, May 2005" ("2005 Policies"); (2) ¶¶ 3P and 3Q of the Agency Agreement; and (3) a 2009 resolution adopted (and subsequently rescinded) by the Board of Directors of UniGroup ("2009 Rescinded Resolution").

Chavis also argued that "[f]or military shipments the United agent to be appointed as origin or destination agent is the local United agent authorized for that military installation." In support of this argument, Chavis relied on (1) three sections from the 2005 Policies; (2) United "Government 01-07" Bulletin issued on March 14, 2007 ("Government Bulletin"); (3) *The Wire: Important News for Mayflower and United Agents*, dated April 24, 2009 ("Newsletter"); and (4) United's Military Directory listing Chavis as the "Qualified Agent" for "Shaw AFB, SC" ("Military Directory").

After reviewing all of the cited documents, the district court granted summary judgment in United's favor. As to non-military shipments, the court concluded that

"[e]ven if [the cited documents] were actual carrier policies, they do not give Chavis any rights to serve as exclusive origin and destination agent."

"To the extent Chavis continue[d] to assert that it is entitled to be the exclusive agent for military shipments to and from Shaw AFB," the court reiterated its prior "rul[ing] that this claim is precluded as a matter of law by the unambiguous language of the agency agreement." Additionally, it found that "the alleged carrier policies cited by Chavis in its supplemental brief do not support this contention or change [the court's] decision that any breach[-]of-[-]contract claim premised on this argument fails."

Finally, the court found the Agency Agreement "unambiguous"and noted its inclusion of an integration clause. As a result, the court determined that "the terms of the parties' agreement cannot b[e] varied by extrinsic evidence."

## II. *Discussion*

On appeal, Chavis argues that the district court erroneously granted summary judgment to United because a genuine issue of material fact exists as to whether United breached its own policies. According to Chavis, United's longstanding policies, incorporated by reference into the Agency Agreement, provide that Chavis is the only authorized agent for Shaw AFB and for its home market and that this status entitles Chavis to serve as the origin and destination agent in those markets. Chavis contends that because substantial evidence demonstrates that these longstanding policies remain in force, the district court erred in concluding United was entitled to summary judgment on Chavis's breach-of-contract claim. Additionally, Chavis argues that the district court erred in denying Chavis's motion to compel discovery.

-6-

A. *Breach of Contract*

"We review de novo the district court's grant of summary judgment to [United] on the breach[-]of[-]contract claim." *Myers v. Richland Cnty.*, 429 F.3d 740, 750 (8th Cir. 2005) (citation omitted). The Agency Agreement provides that it "shall be interpreted in accordance with the laws of the State of Missouri," and both parties agree that Missouri law governs the present dispute.

"Under Missouri law, '[a] breach of contract action includes the following essential elements: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff.'" *Smith Flooring, Inc. v. Pa. Lumbermens Mut. Ins. Co.*, 713 F.3d 933, 941 (8th Cir. 2013) (alteration in original) (quoting *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. 2010) (en banc)). "'Under Missouri law, summary judgment is appropriate [in a contract case] where the language of the contract is clear and unambiguous such that the meaning of the portion of the contract in issue is so apparent that it may be determined from the four corners of the document.'" *Deal v. Consumer Programs, Inc.*, 470 F.3d 1225, 1229 (8th Cir. 2006) (alteration in original) (quoting *Family Snacks of N.C., Inc. v. Prepared Prods. Co.*, 295 F.3d 864, 867 (8th Cir. 2002)). A court must enforce as written a contract that "'uses plain and unequivocal language.'" *Id*. at 1230 (quoting *Lake Cable, Inc. v. Trittler*, 914 S.W.2d 431, 436 (Mo. Ct. App. 1996)).

"Whether a contract is ambiguous is a question of law." *Lafarge N. Am., Inc. v. Discovery Grp. L.L.C.*, 574 F.3d 973, 979 (8th Cir. 2009) (citing *Edgewater Health Care, Inc. v. Health Sys. Mgmt., Inc.*, 752 S.W.2d 860, 865 (Mo. Ct. App. 1988)). "To determine whether a contract is ambiguous, we consider the instrument as a whole, giving the words contained therein their ordinary meaning." *Deal*, 470 F.3d at 1229 (citing *Young Dental Mfg. Co. v. Engineered Prods. Inc.*, 838 S.W.2d 154, 156 (Mo. Ct. App. 1992)). The parties may disagree about the contract's meaning without it

being necessarily ambiguous. *Id.* (citing *Sligo, Inc. v. Nevois*, 84 F.3d 1014, 1019 (8th Cir. 1996)). "If the contract is unambiguous, then the intent of the parties is to be gathered from the contract alone, and 'any extrinsic or parol[] evidence as to the intent and meaning of the contract must be excluded from the court's review.'" *Lafarge*, 574 F.3d at 979 (quoting *Vidacak v. Okla. Farmers Union Mut. Ins. Co.*, 274 S.W.3d 487, 490 (Mo. Ct. App. 2008); *see also Smith Flooring*, 713 F.3d at 938 ("[T]he parol evidence rule bars admission of extrinsic evidence to vary or contradict the terms of an unambiguous and completely integrated written agreement." (citation omitted)).

"Where a contract is ambiguous and unclear, however, 'a court may resort to extrinsic evidence to resolve an ambiguity.'" *Lafarge*, 574 F.3d at 979 (quoting *Burrus v. HBE Corp.*, 211 S.W.3d 613, 616 (Mo. Ct. App. 2006)). An ambiguous contract is one that "'is reasonably susceptible to different constructions.'" *Id.* (quoting *Burrus*, 211 S.W.3d at 616). "If a contract is ambiguous, 'then a question of fact arises as to the intent of the parties, and thus it is error to grant summary judgment.'" *Id.* (quoting *Essex Dev., Inc. v. Cotton Custom Homes, L.L.C.*, 195 S.W.3d 532, 535 (Mo. Ct. App. 2006)).

## 1. *Non-military Shipments*

"Missouri law considers 'the existence and terms of a contract' to be essential elements of a breach-of-contract action." *Smith Flooring*, 713 F.3d at 938 (citing *Keveney*, 304 S.W.3d at 104). Thus, our first task is to determine which documents that Chavis identifies are United "policies" incorporated into the Agency Agreement. The Agency Agreement provides that "Carrier Policy(ies)," "whether now existing or as may be issued or amended from time to time during the term of this Agreement, . . . are . . . incorporated herein by reference."

We begin with those documents that Chavis cites in support of its argument that it is the only "authorized" agent for its home market for non-military shipments and that such status entitles it to serve as the origin and destination agent in that

market: (1) the Agency Manual and Agency Reference Manual (ARM); (2) the 2005 Policies; (3) ¶¶ 3P and 3Q of the Agency Agreement; and (4) the 2009 Rescinded Resolution.

### a. *Agency Manual and Agency Reference Manual (ARM)*

Part II of the Agency Manual addresses the origin agent's appointment. It provides that "[t]he booking agent appoints the United agent *closest* to the origin address as origin agent." (Emphasis added.) Part III concerns the destination agent's appointment and provides that "[t]he booking agent appoints the United agent *closest* to the delivery address as destination agent on residential and national account shipments." (Emphasis added.)

The district court agreed with United that the Agency Manual was not a part of the parties' contract based on the "undisputed fact that any hard copy policies pre-dating the bulletin date of September 3, 1996 were replaced by the online agency manual," i.e., the ARM. Recognizing the district court's conclusion based on the undisputed facts that the online ARM replaced the Agency Manual, Chavis argues that a genuine issue of material fact exists as to whether the ARM contains the same policies or is merely an online version of the Agency Manual.

"The burden of proof rests with the party claiming breach of contract." *Scheck Indus. Corp. v. Tarlton Corp.*, 435 S.W.3d 705, 723 (Mo. Ct. App. 2014) (citation omitted). Thus, it is Chavis's burden—not United's—to prove that the online ARM is a part of the parties' agreement. The difficulty for Chavis, however, is that neither party can locate a hard copy version of the ARM. As a result, the ARM's contents are unknown, and Chavis is left to speculate as to whether it contained the same material terms as the Agency Manual.

But the ARM's contents are ultimately of no consequence because the undisputed facts show that the ARM, like the Agency Manual, was eliminated years

ago. Sonja Pullaro of United testified that the ARM was available through the library of Office Automation but that "Office Automation is old, this [the ARM] is very old." She explained that Office Automation "was the precursor to e-mail, so to speak, on a Main Frame System" and was no longer in use. Likewise, Steve Dawkins of United testified that the ARM is "defunct, and it was . . . superseded or taken over by the Agency Resource Guide." Dawkins explained that by "defunct" he meant that the ARM was "no longer in existence" and that the ARM became "defunct" "in the nineties, late nineties, middle nineties." Chavis has offered no evidence challenging or contradicting Pullaro's or Dawkins's testimony. *See Fatemi v. White*, 775 F.3d 1022, 1046 (8th Cir. 2015) ("[O]nce the defendants moved for summary judgment, Dr. Fatemi was required to discard the shielding cloak of formal allegations and meet proof with proof by showing a genuine issue as to a material fact." (quotation and citation omitted)).

Because the Agency Resource Guide superseded the online ARM in the nineties, the ARM *was not* a part of the parties' 2007 Agency Agreement; therefore, it does not matter whether the ARM contained the same terms as the hard copy of the Agency Manual or whether its terms support Chavis's claim. In summary, neither the Agency Manual, which the ARM replaced in 1996, nor the ARM, which the Agency Resource Guide superseded in the nineties, are a part of the parties' 2007 Agency Agreement, as those documents were not in existence at the time of the agreement or thereafter.

b. *2005 Policies*

Chavis also relies on the 2005 Policies in support of its argument that the policies at issue are still in effect, even without reference to the Agency Manual or ARM. The first relied-upon 2005 policy is entitled "Operations—Household Goods" and provides the following concerning "Origin Agents":

Booking agents are required to appoint fully authorized United Van Line agents to represent them as origin and destination agents on all household goods moves[.] If an agent appoints itself as origin or destination agent, such agent shall be responsible for all costs to provide origin or destination services incurred as a result of the failure of such agent to provide or complete such services[.] If a United agent is not available, a Mayflower agent should be selected[.] If a booking agent wishes to use a non-UniGroup agent, approval must be obtained from the appropriate area planner at Headquarters Operations[.]

The second relied-upon 2005 policy is entitled "Agency Business Development" and provides the following concerning "Relocation Within Market": "Approval of agency relocation within a market shall be based on the facts of each case and substantive issues/concerns raised by incumbent agents[.]"

The third relied-upon 2005 policy is entitled "Agency Business Development" and provides the following concerning "Agency Acquisition & Expansion": "When the Board considers agency applications for van line representation, the Director representing an agency making such application and any Directors with agency locations in the relevant market shall be permitted to make a statement to the Board[.]"

United does not dispute that the 2005 Policies are a part of the parties' agreement. But we agree with United that none of these policies support Chavis's breach-of-contract claim because they do not guarantee to Chavis—or any United agent—a single shipment. The first policy merely states that the booking agent must appoint a "fully authorized United agent"; it does not require the booking agent to appoint a particular United agent based on locale or proximity, nor does it use the descriptors "closest," "local," or "exclusive" to describe "fully authorized United agents." As the district court explained, this policy "merely requires a booking agent (which is not even United) to appoint *an* authorized agent. It does not require the

-11-

appointment of any particular United agent (whether defined by proximity or otherwise) and in fact contemplates the appointment of any number of *agents* to provide origin or destination services." (Footnote omitted.) Furthermore, this policy confirms that a booking agent need not appoint any other agent but may instead "appoint[] itself as origin or destination agent."

While Chavis contends that the second and third policies demonstrate "[t]hat United agents are authorized by United for a particular market," we agree with the district court that these provisions "do not speak to Chavis'[s] alleged right to serve as origin or destination agent for any shipment." The second policy "simply states that United shall consider 'the facts of each case' when deciding whether to permit an agent to relocate," and the third policy "merely permits an existing agent to comment on a prospective new agent's application."

c. *Paragraphs 3P and 3Q of the Agency Agreement*

Chavis cites ¶¶ 3P and 3Q of the Agency Agreement in support of its argument that an "authorized" United agent is the "local" agent in the market that must be appointed as origin and destination agent. Those paragraphs provide that the duties of the Agent—Chavis—are:

> P.     To appoint an origin or destination agent when the Agent [Chavis] is at a point other than point of origin or destination and the Agent [Chavis] is not prepared to perform the necessary origin Transportation Services . . . for a shipper; and the Agent [Chavis] agrees the Carrier [United] will divide the appropriate compensation in accordance with Carrier Policies.

> Q.     To appoint an agent of the Carrier [United] as origin agent when the Agent [Chavis] secures an order involving a Shipment originating from the warehouse of an agent of the Carrier [United]; and the Agent [Chavis] agrees the Carrier [United] will divide the booking compensation in accordance with Carrier Policies.

-12-

Chavis interprets these paragraphs to mean that

> when a booking agent—the agent receiving a request from a customer for a move—is not located in the place where the shipment originates, it must appoint as the origin agent the local United agent where the shipment originates. Similarly, when the booking agent is not located in the place where the shipment is destined to go, the booking agent must appoint as the destination agent the local United agent at the destination.

As a threshold matter, we note that ¶¶ 3P and 3Q speak to *Chavis*'s duties as the agent, not the duties of United or other United agents. At oral argument, Chavis confirmed that it has not pleaded its breach-of-contract claim under a third-party beneficiary theory; that is, that it has a third-party beneficiary interest in United's agreements with other agents. Instead, it argues that under the Federal Aviation Administration Authorization Act of 1994 (FAAA), 49 U.S.C. § 13907(a), United is responsible for the acts and omissions of its agents; therefore, Chavis argues that United is liable for other United agents' failure to appoint it as the origin or destination agent when it is the "local United agent."

We need not determine whether United is liable for the acts or omissions of its agents because we, like the district court, conclude that ¶¶ 3P and 3Q do not grant Chavis any rights to serve as an exclusive origin and destination agent. First, ¶ 3P provides that the booking agent may provide origin and destination services for any United order that it obtains when it is located at the place of origin or destination and is prepared to perform—thus, it need not appoint another agent at all.

Second, ¶ 3P directs the booking agent "[t]o appoint *an* origin or destination agent when the Agent is at a point other than point of origin or destination and the Agent is not prepared to perform the necessary origin Transportation Services . . . ." (Emphasis added.) "[T]he articles 'a' and 'an' . . . are general in description

-13-

encompassing any of the class," while "[t]he article 'the' is a word of specificity." *Shelter Mut. Ins. Co. v. Brooks*, 693 S.W.2d 810, 812 (Mo. 1985) (en banc) (quotation omitted); *see also Flandreau Santee Sioux Tribe v. United States*, 197 F.3d 949, 952 (8th Cir. 1999) ("Grammatical niceties should not be resorted to without necessity; but it would be extending liberality to an unwarrantable length to confound the articles 'a' and 'the'. [sic] The most unlettered persons understand that 'a' is indefinite, but 'the' refers to a certain object." (alteration in original) (quoting Black's Law Dictionary 1324 (5th ed. 1979)). As the district court explained:

> Although Chavis argues that this policy requires a booking agent to appoint "*the* local United agent where the shipment originates [or terminates]," this argument is contrary to the plain language of the agreement which unambiguously says "*an*" agent, not "*the*" agent. Once again, Chavis fails to grasp the distinction between "*an*" and "*the*." This distinction, however, is fatal to Chavis'[s] breach[-]of[-]contract claim. Moreover, this provision of the agreement does not use the phrase "local agent" as argued by Chavis. Chavis cannot rewrite the unambiguous language of the agency agreement to create a requirement that the booking agent appoint "the local agent" when no such requirement exists. The language plainly permits the appointment of any origin or destination agent and cannot be read to state otherwise. The same analysis applies to the agency agreement's requirement to appoint "*an* agent of the Carrier as an origin agent when the Agent secures an order involving a shipment originating from the warehouse of an agent of the carrier." (emphasis supplied).

### d. *2009 Rescinded Resolution*

Chavis also argues that the 2009 Rescinded Resolution is a part of the parties' agreement and supports its breach-of-contract claim. The 2009 Rescinded Resolution provides, in relevant part:

> Following discussion, the Board unanimously adopted the following proposal, *which was later rescinded (see below)*:

RESOLVED, where United Van Lines and/or Mayflower Transit has *an authorized agent* either in the market or within 100 miles of origin or within the local agent's public service radius ("Local Agent"), an agent operating under a United or Mayflower agency agreement, or any entity affiliated with that agent, is required to assign *a Local Agent* for origin and destination service. This requirement will apply even if the booking agent intends to pack, load and haul a shipment from the origin location.

\*\*\*

Notwithstanding the adoption of such proposal, *it was later rescinded* by the Board by a vote of seventeen to one. In connection with the rescission, the Board instructed the Operations Committee to consider the matter further before any policy change is presented to the Board for consideration.

(Emphases added.)

Chavis acknowledges the Board's stated rescission of the resolution but argues that "the circumstances of the supposed rescission are highly questionable." It maintains that United "produced a new version of the meeting minutes of April 28–29, 2009, for the first time on December 19, 2012," and that "[t]his later-produced version reflects that it is the fifth version of the minutes." Chavis questions the reference in the minutes to the resolution being "later rescinded" but failing to reflect that someone made a motion to rescind. Chavis also points to the failure of any of United's witnesses who were present to recall the details of the rescission. And, it contends that while the Board purportedly approved the April 28–29, 2009 minutes on August 19–20, 2009, "other information United produced reflects that the fifth version of the April 28–29, 2009 board minutes were not even created until February 9, 2010, which was around the time that Chavis started threatening litigation." Chavis maintains that a genuine issue of material fact exists as to whether a rescission of the 2009 Resolution actually occurred.

-15-

"Although a district court must rule on a motion for summary judgment after viewing the facts in the light most favorable to the non-moving party, it is not required to 'accept unreasonable inferences or sheer speculation as fact.'" *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 791 (8th Cir. 2009) (quoting *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004)). As United points out, Chavis has offered no evidence contradicting "the express and unambiguous rescission of the 2009 resolution documented in the Board minutes. No conflicting testimony. Not a bulletin communicating the resolution to agents. Nothing." While Chavis asserts that United's own witnesses could not recall details about the purported rescission, United cites record evidence in its brief detailing its witnesses' recollection of the rescission. United notes that only one witness testified to not "recalling" the details; this is not the same as a witness testifying that a rescission of the resolution did not occur. *Cf. Unterreiner v. Volkswagen of Am., Inc.*, 8 F.3d 1206, 1210–11 (7th Cir. 1993), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967–68 (7th Cir. 2013) ("Statements of Volkswagen's Personnel Manager, on the other hand, are unequivocal. He claims to have posted a notice which remained on the bulletin board at all times during Unterreiner's employment. Unterreiner might have established a 'genuine' issue of fact by obtaining the deposition testimony or affidavits of other employees who had a better recollection of the bulletin board. He did not do so, and we are left only with his own statement based on a vague and somewhat conflicting recollection. This does not create a genuine issue of material fact.").

Even if we considered the 2009 Rescinded Resolution as part of the parties' agreement, it would not, as the district court explained, "afford Chavis the relief it seeks because the resolution speaks only of assigning '*a*' local agent for origin and destination services." As explained supra, the article "a" is "general in description" and "encompass[es] any of the class." *Shelter*, 693 S.W.2d at 812 (quotation and citation omitted).

-16-

## e. *Conclusion as to Non-military Shipments*

Having reviewed the record, we conclude that none of the documents that Chavis identifies support its argument that it is the only "authorized" agent for its home market for non-military shipments.

## 2. *Military Shipments*

We next consider those documents that Chavis cites in support of its argument that it is the only authorized agent for Shaw AFB: (1) the 2005 Policies; (2) the Government Bulletin; (3) the Newsletter; and (4) the Military Directory. According to Chavis, these "documents confirm that it is United's policy that, for military shipments, United's designated agent for the military installation is to be appointed as origin and destination agent."

## a. *2005 Policies*

Chavis relies on three policies. The first relied-upon 2005 policy is the "Operations—Household Goods" policy concerning "Origin Agents," discussed *supra*. For the reasons set forth above, we conclude that this policy does not support Chavis's breach-of-contract claim because it does not guarantee to Chavis—or any United agent—a single shipment. *See supra* Part II.A.1.b.

The second relied-upon 2005 policy concerns "Agent Military Agency Systems" and provides, in relevant part:

> *United Agents with their own DOT and Military Traffic Management Command authority* are allowed to establish a Military Agency System. Except as provided herein, all such shipments booked shall be hauled on United authority, and all such arrangements will be subject to approval on a case-by-case basis by United[.] These arrangements shall not be permanent and are subject to modification to comply with any eventual new Military Traffic Management procedure[.]

-17-

> Military agency systems established by United Van Lines agents will be made up of *United agents* whenever possible[.] If current *United agents* are fully represented at a specific military installation, military carrier agents may seek non-United agent representation[.]

(Emphases added.)

The third relied-upon 2005 policy concerns "Military Only Agents" and provides:

> Management is authorized to appoint MILITARY ONLY agents at military bases where the corporation has no current representation and that, as a last resort, Management be authorized to appoint MILITARY ONLY agents in situations where present agent refuses to book tonnage at recommended rate levels . . . .

United does not contest that these policies are part of the parties' agreement. But these policies do not support Chavis's contention that it is the exclusive agent for military shipments to and from Shaw AFB. The second policy addresses the servicing networks formed by United agents acting as independent military carriers under their own Department of Transportation-issued operating authority and contracting directly with the military. Thus, as the district court explained, this "policy only applies to United agents when they act *independently* as carriers to contract directly with the military. Moreover, it leaves the determination of when and whether to use United agents to service these shipments to the independent carrier agents themselves." The policy refers to "agents," not "agent." And it does not contain the descriptors "exclusive," "closest," or "local."

The third policy authorizing United "to appoint MILITARY ONLY agents at military bases where the corporation has no current representation" permits United to appoint non-United booking agents on military shipments that United obtains at

-18-

bases not currently serviced by anyone in the United-agency system. As the district court explained, this policy "certainly does not apply here, where Chavis and other United agents service Shaw AFB. Moreover, this alleged policy does not speak to which destination and origin agents should be appointed: it deals instead with booking agents, which is not even part of Chavis'[s] claim." And, like the previously discussed policy, this policy refers to "agents," not "an" agent.

### b. *Government Bulletin*

Chavis also argues that the Government Bulletin supports its argument that it is the *only* United agent that is qualified to service Shaw AFB. The Government Bulletin provides:

1.  The booking agent is responsible for selecting a DoD approved UniGroup agent to provide SIT for DoD shipments. The agent selected must be approved through a military inspection process before they can store DoD household goods. If there are no UniGroup agents[4] available at destination to provide SIT, the booking agent should contact the origin transportation office and request permission to store the shipment at origin to avoid out of area storage at destination. This should be done before a van is assigned and the shipment loads.

2.  UniGroup agents must be used to provide SIT for UniGroup DoD shipments unless approved by the UniGroup Government Transportation department. This is to preclude loss and damage problems associated with non-UniGroup storage locations which impact the UniGroup quality score and future UniGroup DoD business. This policy also helps to prevent claims adjudication problems . . . .

* * *

---

[4]UniGroup is the parent company of two sister household goods carriers, United Van Lines and Mayflower Transit. "UniGroup agents" thus refers to both independent United and Mayflower agents.

-19-

4.     If the hauling agent or destination agent is unable to clear the shipment for direct delivery and the prearranged storage is no longer available, the booking agent must find the closest UniGroup agent who can provide storage. Agent information is available in the on-line Military Directory on the UniGroup intranet for reference. If the agent selected is outside the local storage area, ask the destination Traffic Manager for approval to store the shipment outside the local area and authorization for the long delivery out of SIT. The booking agent must approve any change in DA assignment. If the base will not approve storage outside the area, call your area Household Goods planner/manager or the UniGroup Government Transportation department for Instructions. DO NOT store the shipment in a non-UniGroup (foreign) warehouse unless approved by the UniGroup Government Transportation department. . . .

Again, United does not contest that the Government Bulletin constitutes an applicable "policy"; instead, it argues that this policy does not support Chavis's claim that it is United's exclusive agent for Shaw AFB. We agree. As the district court explained, this Government Bulletin "deals with emergency situations where storage must be found on short notice and does not even address appointment of origin or destination agents." Furthermore, as United points out, the Government Bulletin provides that the booking agent "could select 'the closest' United or Mayflower agent with available military-approved storage or, alternatively, a nearby non-UniGroup agent with United's approval."

### c. *Military Directory*

Chavis cites the Military Directory as listing it "as the *only* United agent that is a 'Qualified Agent' for Shaw Air Force Base." In response, United characterizes the Military Directory as extrinsic evidence that is not part of the parties' agreement. The Military Directory provides, in relevant part:

| *Qualified Agents* | *Location*: |
|---|---|
| *Shaw AFB, SC* | |
| U528—Chavis Van & Stg of Myrtle Beach | Conway, SC |
| M1516—Nilson Van & Storage | Sumter, SC |

Chavis has not produced any evidence that the parties intended this document to be part of their agreement; in any event, even if the Military Directory were a part of the parties' agreement, it does not support Chavis's claim to exclusivity. It uses the descriptor "qualified," not "only," "exclusive," or "closest."

Furthermore, as United points out, while Chavis is the only listed *United* agent, it *is not* the closest *UniGroup* agent listed in the Military Directory to Shaw AFB; instead, Nilson Van & Storage in Sumter, South Carolina, is the closest agent. Chavis, by contrast, is in Conway, South Carolina, over 80 miles away from Shaw AFB. This is a fact that we may take judicial notice of. *See Hartman v. United States*, 538 F.2d 1336, 1346 (8th Cir. 1976) ("[T]he district court properly took judicial notice of the fact that Fort Smith is more than one hundred miles distant from St. Louis; similar notice may be taken with respect to all of Logan County, Arkansas in which Booneville is located.").

### d. *Newsletter*

Finally, Chavis relies on the Newsletter in support of its exclusivity claim; this article states, in relevant part:

DP3 Shipment Allocation for UniGroup DoD TSPs . . . There are several factors used when making decisions regarding allocation of United and Mayflower authority DP3 shipments to booking/origin agents. Some of these factors include current DoD five-star ratings, agent proximity to origin of shipment, current DoD-approved warehouses and availability to service the shipment. When a Transportation Service Provider (TSP) is tendered a shipment in DPS, the shipment must be serviced in a high-quality manner to generate higher best-value scores. Poor service or failures of any kind will result in lower best-value scores for the TSP

and could result in nationwide suspension. In situations when agents in the area are unable to provide the required services, the selection of the booker/origin agent will move outside the area of responsibility. It is important for agents to monitor their DoD five-star ratings. These ratings are available through DSPA, NGS Agent or the DoD Government section on The U (*www.unigroupinc.net*). Additional DoD five-star rating information is provided in Mayflower Bulletin #2045, United Bulletin #08-06 and DP3 information is provided in Agent Communication #208090098. If you have questions, contact the Government Transportation department.

As with the Military Directory, Chavis has not produced any evidence that the parties intended the Newsletter to be part of their agreement. In any event, as the district court recognized, the article "says nothing of Chavis'[s] alleged right to exclusivity and does not support its breach[-]of[-]contract claim in any way."

### e. *Conclusion as to Military Shipments*

Having reviewed the record, we conclude that none of the documents that Chavis identifies support its argument that it is the exclusive agent for military shipments to and from Shaw AFB.

### 3. *Conclusion as to Breach-of-Contract Claim*

We conclude that the parties' agreement is unambiguous. The terms of the parties' agreement do not provide that Chavis is the only "authorized" agent for its home market for non-military shipment or that Chavis is the exclusive agent for military shipments to and from Shaw AFB. As a result, United did not breach the agreement.[5]

---

[5]Because we find the parties' agreement clear and unambiguous, we are prohibited from resorting to extrinsic evidence to establish the intent and meaning of the parties' agreement. As a result, we will not consider witness testimony, emails, or other documents purporting to explain the agreement. *See Lafarge*, 574 F.3d at 979.

## B. *Discovery*

Chavis argues that the district court erred in denying its motion to compel discovery. Specifically, it challenges the district court's ruling on document requests concerning United's "policies, rules, procedures, or directives" and interrogatories and document requests concerning alleged damages.

Chavis made 64 document requests to United. United agreed to produce some responsive documents but also lodged several objections based on the requests being, among other things, overbroad, unduly burdensome, vague, or ambiguous. Chavis filed a motion to compel, which the district court denied without prejudice. The court denied the motion based on its belief that Chavis's counsel did not satisfy "his obligation to attempt to resolve this dispute in good faith before filing the motion to compel under Local Rule 3.04." The court advised Chavis that

> [a]ny future discovery motions should demonstrate that counsel invested sufficient time and effort into resolving these discovery disputes (instead of simply highlighting them in anticipation for future Court involvement) before the motion was filed, and *in no event shall any party file a motion relating to ESI [electronically stored information] without demonstrating that they discussed in good faith a plan for discovery of ESI with the opposing party. Good faith requires a party affirmatively propose a plan for the discovery of ESI.*

Thereafter, Chavis filed a second motion to compel, representing that it had conferred in good faith. The district court again denied Chavis's motion to compel and warned Chavis "that [Chavis] and [its] counsel will be sanctioned if [it] file[s] another motion to compel without first using sincere, good faith efforts to resolve every topic raised in the motion to compel." (Bold and underline omitted.) Chavis then filed a motion asking the court to reconsider its "finding that Chavis had not engaged in sincere, good faith efforts to resolve the discovery disputes so that Chavis'[s] Motion to Compel Discovery could be addressed on the merits." The court denied the motion for reconsideration, stating that Chavis "mistakenly believe[s] that

[its] motion was denied for failure to meet and confer as required by Local Rule 3.04." The court clarified that the motion "was denied on the merits, and there is nothing in the motion for reconsideration that convinces me my prior ruling was in error."

Thereafter, in its memorandum and order granting summary judgment to United, the district court commented:

> Incredibly, Chavis attempts to blame the Court for its inability to state a breach[-]of[-]contract claim because I declined to compel defendants to respond to Chavis'[s] *irrelevant and overly burdensome* discovery requests. Yet Chavis cannot explain how it could even bring, no less maintain, a breach[-]of[-]contract claim without even knowing what contract terms defendants allegedly breached. Throughout this case, Chavis has employed a "throw everything against the wall and see what sticks" approach to litigation. The resulting mess is of its own—not the Court's—making.

We review for an abuse of discretion a district court's discovery decision. *United States ex rel. Kraxberger v. Kan. City Power & Light Co.*, 756 F.3d 1075, 1082 (8th Cir. 2014) (citation omitted). "'A district court has very wide discretion in handling pretrial discovery and [this court is] most unlikely to fault its judgment unless, in the totality of the circumstances, its rulings are seen to be a gross abuse of discretion resulting in fundamental unfairness in the trial of the case.'" *Id*. (quoting *Voegeli v. Lewis*, 568 F.2d 89, 96 (8th Cir. 1977)). "If [Chavis] can demonstrate a gross abuse of discretion, then [it] must also demonstrate prejudice." *Carr v. Anheuser-Busch Cos., Inc.*, 495 F. App'x 757, 767–68 (8th Cir. 2012) (citing *Ranger Transp., Inc. v. Wal-Mart Stores*, 903 F.2d 1185, 1187 (8th Cir. 1990) (per curiam)).

> "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Broad discovery is an important tool for the litigant, and so "[r]elevant information need not be admissible at the trial if the discovery appears

-24-

reasonably calculated to lead to the discovery of admissible evidence."
*Id*. That said,

> the [district] court must limit the frequency or extent of discovery otherwise allowed . . . if it determines that . . . the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

*WWP, Inc. v. Wounded Warriors Family Support, Inc*., 628 F.3d 1032, 1039 (8th Cir. 2011) (alterations in original) (quoting Fed. R. Civ. P. 26(b)(2)(C)(iii)).

Here, the district court explained why it denied the motion to compel—the discovery requests were overly burdensome in that Chavis could not first identify what contract terms it was alleging that United breached. Having reviewed the full record, we conclude that the district court's denial of Chavis's motion to compel was not an abuse of discretion.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____